IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

L&C CONSULTANTS, LLC          §
                             §
              Plaintiff,      §
                             §  Civil Action No. 3:07-CV-1904-D
VS.                           §
                             §
ASH PETROLEUM, INC., et al.,  §
                             §
              Defendants.     §

MEMORANDUM OPINION

In this removed diversity action, plaintiff L&C Consultants, LLC ("L&C") sues defendants ASH Petroleum, Inc. ("ASH"), James W. Peak ("Peak"), and Gene H. Irwin ("Irwin") for breach of contract, fraud, fraudulent inducement, and, alternatively, conversion. Following a bench trial, and for the reasons that follow,[1] the court finds and concludes that L&C proved its breach of contract claim against ASH and its claims for fraud and fraudulent inducement against all defendants. The court enters judgment in favor of L&C in accordance with this memorandum opinion.

_____

[1] The court sets out in this memorandum opinion its findings of fact and conclusions of law. *See* Fed. R. Civ. P. 52(a)(1). Although the court has carefully considered the trial testimony and exhibits, this memorandum opinion has been written to comply with the level of detail required in this circuit for findings of fact and conclusions of law. *See, e.g., Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) (discussing standards). The court has not set out its findings and conclusions in punctilious detail, slavishly traced the claims issue by issue and witness by witness, or indulged in exegetics, parsing or declaiming every fact and each nuance and hypothesis. It has instead written a memorandum opinion that contains findings and conclusions that provide a clear understanding of the basis for the court's decision.

I

In the spring of 2006, L&C, an oil and gas investment company, invested money in oil and gas drilling operations of ASH.  ASH and L&C had both previously done business with Woodberry Capital Group ("Woodberry").  L&C had invested with Woodberry.  Woodberry had in turn entered into a production agreement with ASH on a drilling project known as Liepers, later referred to as Fort Payne ("Ft. Payne").  By the spring of 2006, however, Woodberry wanted to drop out of the business arrangement, and ASH and L&C had begun negotiating directly about an oil and gas production agreement.

On April 3, 2006 L&C executive Kenneth P. Lawrence ("Lawrence") and others, including third party William Hudson ("Hudson"), met with Irwin, the President of ASH, to discuss a proposed investment in drilling operations.  After further negotiations via telephone and email, ASH prepared a "Memorandum of Understanding" ("MOU") stating the terms of an agreement between ASH and L&C regarding the continuation of the Ft. Payne operation between the two parties directly, and the addition of a new operation called Rowe-Knox-6 ("Knox").  The MOU was signed on April 19, 2006 by Peak and Irwin on behalf of ASH,[2] and on April 20, 2006 by Lawrence and Todd Crosby ("Crosby") on behalf of L&C.

---

[2]Arguments were presented at trial concerning the capacities in which Peak and Irwin signed the MOU.  Because L&C is suing only ASH for breaching the MOU, the court need not address whether Peak and Irwin can be held individually liable.

The MOU stated that there was no contract between the two entities at the time, but it specified various terms under which drilling would continue in the Ft. Payne area and begin in the Knox area.  Of significance to L&C's claims in this case, the terms included the following production guarantees by ASH.  The first concerned the Ft. Payne area.

> During our conference call, ASH Petroleum, Inc. has agreed to warrant to L & C Consultants an average "volume of daily performance" for the pending ten (10) wells in the "Fort Payne Formation" (or equivalent) of 12 BOPD per well, for an aggregate volume of 120 BOPD.  The royalty on the production amounts to a non-negotiable 12.5% to the landowner.  Thus, after operating expenses, L & C Consultants, LLC would be provided 55% of the Net Working Interest.
>
> This offer was accepted by L & C Consultants, provided that the production period was satisfactory.  ASH Petroleum, Inc. then offered to guarantee that volume rate for a period of not less than one year, or an average production month (of 27 days) times 12.  In all of our estimates and agreements with Woodberry Capital, there are shared operating costs prior to Net Working Interest. (These are described later in this letter).
>
> Part of the Operating Costs in this and in future work included a 10% "downtime" per month, to allow for remedial work and periodic maintenance and repairs.  Thus, a production month would be for a total of 27 days, and the production year would be for 324 days.  At this rate, the total volume of oil which ASH Petroleum would assign via Division Orders to L & C Consulting would amount to about 38,880 BO, subject to operating costs, royalty, reserves and shared Working Interest.

P. Ex. 1 at 1.

The second related to the Knox area.

> In this particular situation, ASH Petroleum, Inc. will issue to you (L & C Consulting) a one-time production guarantee, non-transferable, which equals 20 BOPD per well in the KNOX (or similar) structure.  We will drill a minimum of 5 wells to get you the 100 BOPD, we will continue to add to the division order until we stabilize at 100 BOPD for a full production year, or 27 days times 12 months as before, which is 32,400 BO in the first year.  However, the Royalty and Owner equity is higher on producing locations, than non-producing leases.  We will have a Gross Working Interest of 77.5% to split into our Net Working Interest (55/45).  Keep in mind, that these wells could have a lifespan [sic] of 20 years like those currently on the recommended lease.

P. Ex. 1 at 2.

Taken together, these provisions guaranteed L&C payment—regardless of the success of the drilling operations—based on a percentage of a total of 71,280 barrels of oil, i.e., 38,880 for Ft. Payne and 32,400 for Knox, minus certain costs, royalties, reserves, and working interests.  According to Lawrence, before the MOU was prepared, it was represented to L&C that ASH would continue to drill wells until it was able to pay or produce this amount of oil.  Such a guarantee was unusual in the oil and gas industry and was material to L&C's decision to invest.  Rather than investing and assuming the risks associated with drilling (e.g., a dry hole), L&C was investing in exchange for a guarantee of production, either in barrels of oil or their value, regardless whether wells actually produced oil.

On April 20, 2006 Irwin sent L&C the MOU as well as an operating agreement for a newly formed entity, Rowe-Knox-6, LLC ("Rowe-Knox-6"), created to run the new drilling operations in the Knox area.  In the cover letter to these documents, Irwin explained that the documents would "provide you with guaranteed drilling results in the KNOX formation in Central Kentucky."  P. Ex. 3.

Two operating agreements were eventually signed: one creating Ft.Payne-Metcalfe-KY-1, LLC, a Florida limited liability company (the "Ft. Payne Operating Agreement"), and one creating Rowe-Knox-6, another Florida limited liability company (the "Knox Operating Agreement") (collectively, the "Operating Agreements").  The Knox Operating Agreement took effect May 9, 2006, and the Ft. Payne Operating Agreement took effect June 30, 2006.  ASH and L&C were listed as the Initial Members of the new companies.  The Ft. Payne Operating Agreement explicitly acknowledged, ratified, and confirmed the MOU as part of the agreement.  The Knox Operating Agreement did not.

During and after the execution of the MOU and the Operating Agreements, L&C transferred substantial sums of money to ASH, either directly or through Woodberry.  ASH argues that the payments were incomplete and late, which L&C disputes.  L&C never received any production payments or barrels of oil from ASH.  L&C maintains that it has not received any accounting of the drilling operations.  ASH posits that no accounting is required and that a complete

accounting was given for the Knox operation.

L&C sued ASH in Texas state court, and defendants later removed the lawsuit to this court on the basis of diversity jurisdiction.  The parties tried the case in a bench trial.[3]

## II

The court turns first to L&C's breach of contract claim, which is based on the MOU's guarantees of production and is asserted only against ASH.

### A

"A diversity court applies the choice-of-law rules of the state in which it sits." *Interfirst Bank Clifton v. Fernandez*, 853 F.2d 292, 294 (5th Cir. 1988) (citing *Stuart v. Spademan*, 772 F.2d 1185, 1195 (5th Cir. 1985)).  Because this court sits in Texas, it applies Texas choice-of-law rules.  In this case, it is undisputed that Texas law applies to L&C's breach of contract claim.

---

[3]In deciding this case, the court has applied a "preponderance of the evidence" standard except where otherwise stated, when it has applied a "clear and convincing evidence" standard.

A "preponderance of the evidence" means such evidence as, when considered and compared with that opposed to it, has more convincing force and produces in the court's mind as trier of fact a belief that what is sought to be proved is more likely true than not true.  To establish a claim by a "preponderance of the evidence" merely means to prove that the claim is more likely so than not so.

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.  The clear and convincing evidence standard is a heavier burden than the preponderance of the evidence standard.

To establish a claim for breach of contract under Texas law, L&C must prove (1) the existence of a valid contract, (2) L&C performed or tendered performance of its duties under the contract, (3) defendants breached the contract, and (4) L&C suffered damages as a result of the breach. *See, e.g.*, *Lewis v. Bank of Am. NA,* 343 F.3d 540, 544-45 (5th Cir. 2003). Defendants argue that the Knox Operating Agreement is the controlling instrument between the parties. L&C does not contest the validity of the Knox Operating Agreement, but it argues that the MOU is also a binding contract.

B

The Knox Operating Agreement (P. Ex. 5), which took effect May 9, 2006, was prepared by Irwin and signed by Lawrence and Crosby for L&C, but the line for Peak's signature was left blank. Because L&C and ASH treat the agreement as binding, however, and rely on its validity in this court, the court holds that the Knox Operating Agreement is binding on both parties. The Knox Operating Agreement was circulated on April 20, 2006 together with the MOU, and it contains the following pertinent language:

> On April 19, 2006, ASH Petroleum, Inc. hereby warrants to L & C Consultants, LLC that it will provide the company with production of oil in an amount of not less than 100 Bbls Oil/day for 27 days per month X 12 months, for these initial (5) KNOX production wells, and one (1) injection well [sic] ASH Petroleum, Inc. includes the above warranty in lieu of losses incurred during the drilling phase of these wells. In the event that one drilling operation fails to go to development, ASH Petroleum will use the remaining funds

- 7 -

> available to explore another site location.
> ASH Petroleum will cover any projected
> overages, but only for these five (5) wells,
> but retains the right to halt field
> construction if it appears that progress isn't
> satisfactory, or other issues which would make
> the completion of the well uneconomical. This
> warrant and pricing offer to L&C Consultants
> is valid for a period of ten (10) physical
> days, afterwhich [sic] the pricing and
> guaranteed warranty will become null and void
> for this project. Time is of the essence.

P. Ex. 5, Ex. A § 3.

The Ft. Payne Operating Agreement (P. Ex. 4), which took effect June 30, 2006, is signed by Peak as CEO of ASH, and Crosby and Lawrence as Managers of L&C. Although defendants argue that the Knox agreement is the controlling instrument of the relationship between the parties, the court finds and concludes that the Ft. Payne Operating Agreement——signed after the Knox agreement became effective——is also valid and enforceable. The contract appears to have been properly executed, and defendants have raised no issues about its formation. The contract contains the following pertinent language:

> Production Commitment. The parties
> acknowledge that they entered into that
> certain "Memorandum of Understanding as of
> April 19, 2006" . . . . *The parties ratify
> and confirm the Memorandum as a part of the
> Restated Operating Agreement, and it is hereby
> incorporated therein by this reference.* It is
> further agreed that as to the production
> commitment provisions of the Memorandum, Ash
> Petroleum, Inc. shall retain the sole and
> absolute right and discretion to either
> substitute other oil production wells and/or
> production from locations other than the

> present Kentucky exploration and production
> efforts on behalf of the Company, or provide
> assignments of working interests in any non-
> Company production wells by issuing Division
> Orders to satisfy such production commitment,
> and full and complete control of the timing of
> such substituted wells or production.  As to
> any such substituted wells or production, Ash
> Petroleum, Inc. shall retain all interests in
> and to all of the Indirect and Direct Costs,
> Rework and Exemptions as permitted by the
> Federal Tax Code.

P. Ex. 4, Ex. A § 7 (bold font omitted; emphasis added).  The Ft.
Payne Operating Agreement clearly incorporated the MOU.  And it
confirmed the nature of the guarantee by providing that, as to the
production commitment provisions of the MOU, ASH had the right and
discretion to substitute other oil production wells and production
from other locations, or to provide assignments of working
interests in non-company production wells "to satisfy such
production commitment." *Id.*  The court therefore concludes that,
as to the Ft. Payne operations, the MOU is enforceable through the
Ft. Payne Operating Agreement.

The Knox Operating Agreement does not explicitly incorporate
the MOU, but the promises in the section of the agreement entitled
"Warranty," excerpted above, correspond in all material respects
with the terms of the "one-time production guarantee" contained in
the MOU.  The Knox warranty is the functional equivalent of the
production guarantee described in the MOU: both promise production
of 100 barrels of oil per day for 27 days per month for 12 months,
i.e., 32,400 barrels of oil.  The language of the Knox warranty

- 9 -

section, e.g., the description of a "guaranteed warranty," demonstrates that the parties' objective intent was to contract for a production guarantee.  In addition, the warranty under the Knox Operating Agreement indirectly references the MOU and its production guarantee by stating that ASH makes the warranty on April 19, 2006——the day the MOU was signed by ASH.  Despite the variation in the language between the production guarantee in the MOU and the guaranteed warranty in the Knox Operating Agreement, the court concludes the parties' intent was the same in each. Further, within the MOU, a contemporaneous and complementary document, the parties used the terms "warrant" and "guarantee" interchangeably, demonstrating that they understood the terms to be functionally equivalent.  Because both parties agree the Knox Operating Agreement is valid and enforceable, the warranty contained within that agreement is also enforceable.

The court finds and concludes that the Operating Agreements are valid and enforceable contracts between ASH and L&C, and that ASH guaranteed L&C a total of 71,280 barrels of oil through the two agreements.  The court need not consider whether the MOU is enforceable as a stand-alone contract because the production guarantees are enforceable through the Operating Agreements.

C

Having decided that both Operating Agreements are enforceable contracts, the court next considers whether L&C has proved that it performed or tendered performance of its duties under the contracts. Apart from the contentions addressed next, it is otherwise undisputed that L&C performed its obligations to tender investment funds under the contracts.

Defendants maintain that L&C anticipatorily breached the agreements by failing to transfer the required funds on time and in the proper amounts. The court finds that L&C transferred $1,456,600 to ASH or its representatives, either directly or through Woodberry. Of that amount, $946,600 was transferred on or after April 20, 2006, when the MOU was signed. According to the payment schedule outlined in the Knox Operating Agreement, it appears that after the first payment was made, each of the three subsequent payments was between one week and one month late. The agreements did not specify that late payments would be a breach of contract. Further, ASH apparently accepted these payments without protest, indicating the continuation of the contract. *See, e.g., Gupta v. E. Idaho Tumor Inst., Inc.*, 140 S.W.3d 747, 756 (Tex. App. 2004, pet. denied) ("If the non-breaching party elects to treat the contract as continuing and insists the party in default continue performance, the previous breach constitutes no excuse for nonperformance on the part of the party not in default and the

- 11 -

contract continues in force for the benefit of both parties"). For example, in a letter dated August 9, 2007, Peak reported on the expenses in the Knox operation and confirmed the receipt of $858,000 from L&C, and it did not question the timing of the payment or suggest that it was a breach of contract. *See* P. Ex. 11 (indicating the Knox operations were "being performed" and not yet terminated). The court holds that L&C did not breach the Knox Operating Agreement by making these payments when it did.

As for the Ft. Payne Operating Agreement, the section of the agreement entitled "Payments by L & C" reads: "Woodberry Capital Enhancement Group, Inc., a Texas Corporation, on behalf of L & C, has paid or caused to be paid as Capital to the Company all monies due[.]" P. Ex. 4, Ex. A § 2. The court finds this to be an acknowledgment that L&C had previously paid funds to ASH through Woodberry as an intermediary and had satisfied all funding obligations under the contracts between the two parties relating to Ft. Payne.

The court therefore finds that L&C performed under the contracts between L&C and ASH.

D

The court now considers whether ASH breached the contracts and whether any breach caused damage to L&C.

Through the incorporation of the MOU, ASH warranted production of 38,880 barrels of oil with respect to the Ft. Payne area, and

- 12 -

under the Knox Operating Agreement it warranted 32,400 barrels of oil with respect to the Knox area.  L&C was entitled to receive its share of these guaranteed barrels.  The parties have stipulated that defendants have paid no money to L&C.[4]  Because the Operating Agreements promise a return in the form of a production guarantee, and ASH did not provide barrels of oil or pay L&C any money in lieu of oil, ASH breached the Operating Agreements, causing financial harm to L&C.

In summary, the court finds and concludes that there are valid contracts between L&C and ASH, L&C performed under the contracts, ASH breached them, and ASH thereby damaged L&C.  The court therefore finds in favor of L&C on its breach of contract claim against ASH.

## III

The court turns next to L&C's claim against all defendants for fraud.  L&C alleges that defendants made misrepresentations as to the guarantee or warranty of a fixed return, measured in barrels of oil.

## A

"Fraud must be proved at trial by a preponderance of the evidence." *Huynh v. Phung*, 2007 WL 495023, at *2 (Tex. App. Feb. 16, 2007, no pet.) (not designated for publication).  The elements of common law fraud in Texas are

---

[4]In fact, the evidence suggests that ASH is now defunct.

> (1) a material representation was made; (2) it
> was false when made; (3) the speaker either
> knew it was false, or made it without
> knowledge of its truth; (4) the speaker made
> it with the intent that it should be acted
> upon; (5) the party acted in reliance; and (6)
> the party was injured as a result.  To show
> fraud based on promise of future performance,
> a plaintiff must also show that the person
> making the promise had no intention of
> performing *at the time he made the promise*.

*Fluorine On Call Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 858 (5th

Cir. 2004) (Texas law) (emphasis added) (internal citations

omitted).  Under Texas law, "a contract may be induced by fraud

when a party promises to perform the contract while knowing that it

has no intention of carrying out that promise."  *DeWitt County

Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 105 (Tex. 1999).  While

fraudulent intent "is determined at the time the party made the

representation, it may be inferred from the party's subsequent acts

after the representation is made."  *Spoljaric v. Percival Tours,

Inc.*, 708 S.W.2d 432, 434 (Tex. 1986).  "Failure to perform [a

promise], standing alone, is no evidence of the promissor's intent

not to perform when the promise was made.  However, that fact is a

circumstance to be considered with other facts to establish

intent."  *Id.* at 435.  "[A] party's denial that they ever made a

promise is a factor showing no intent to perform when they made the

promise."  *Id.*

B

The court finds that ASH and Irwin falsely represented to L&C that it would receive a guaranteed return of oil or money (measured in barrels of oil) on its investment, and that the guarantee would be as represented in the MOU.  Lawrence testified that Irwin made such representations orally during their meeting and conversations in April 2006.  In addition, Hudson, a third-party unconnected to L&C and ASH, testified that he was present at the April 3, 2006 meeting between L&C and ASH.  Hudson confirmed Lawrence's testimony, stating that Irwin had made a guarantee of production at that meeting, at least as to the Ft. Payne operations.  The court finds this testimony to be credible.  Finally, the language in the MOU and Operating Agreements stating that there were guarantees and warranties corroborates that ASH and Irwin represented that L&C would be paid through a production guarantee.

The court also finds that Peak made similar false representations.  Although there is no evidence that Peak ever met with L&C in person or spoke with Lawrence directly, he also made the misrepresentations because he signed all of the agreements promising a production guarantee.[5]

_____

[5]Although the court finds that L&C proved by a preponderance of the evidence all of the elements of fraud and fraudulent inducement against Peak, the court finds that L&C did not prove the elements of its fraud claims against Peak by clear and convincing evidence.  L&C did not take Peak's deposition or subpoena him so that it could offer his testimony at trial.  And in exchange for defendants' agreement at trial not to object to the introduction of

The false representations that defendants made about the production guarantee were material when made. L&C would not have invested had the guarantee not been made.

C

Next, the court finds that ASH, Irwin, and Peak knew the representations were false when they made them; that they made them with the intent that L&C should act on them; and that, when they made them, they had no intention of performing the guarantee.

> While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made . . . . Since intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence. Slight circumstantial evidence of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent.

*Spoljaric*, 708 S.W.2d at 434-35 (citations omitted).

The court finds through circumstantial evidence that defendants knew that the representations were false when they were made. Irwin testified there were no production guarantees made, despite the contrary evidence contained in the contracts

---

L&C's expert report in the absence of L&C's calling the expert to testify, L&C opted not to delay the completion of trial so that it could depose Peak. As a result, the record lacks clear and convincing evidence that Peak committed the torts of fraud and fraudulent inducement. Although this deficiency prevents L&C from recovering exemplary damages from Peak, the evidence is sufficient to find fraud by a preponderance of the evidence and to award L&C actual damages against Peak.

themselves.  The most credible explanation for why warranties and guarantees——admittedly unusual terms in oil and gas contracts——would be mentioned in the contracts is that *these guarantees were in fact made*.  Defendants failed to offer any other credible explanation for their inclusion.[6]  Irwin's unwillingness to admit that the guarantee was made——despite unmistakable evidence that it was——demonstrates his (and ASH's) willful intention not to perform the promise of the guarantee.  *See id.* at 435 ("[A] party's denial that he ever made a promise is a factor showing no intent to perform when he made the promise.").

Moreover, there is no persuasive evidence in the trial record that ASH ever drilled wells in accordance with its contractual obligations.  And the testimony made clear that the accounting of the oil and gas operations was performed shoddily, if at all, and that the limited information ASH provided was not typical of the detailed information that is usually provided in the industry. Even after months of requests for an accounting or a report, the only report produced at trial——the financial summary Peak sent to L&C in August 2007——raises doubts regarding ASH's intent to drill for oil and to perform according to the representations made to L&C.  Of the more than $1 million dollars that L&C invested, it

---

[6]When in this memorandum opinion the court discusses defendants' failure to offer proof, the court has not shifted the burden of proof to defendants.  The court is permitted as trier of fact, however, to rely on the absence of such evidence in deciding whether L&C has met its burden of proof.

appears that only $105,768.54 was spent on the Knox operations more than one year after operations commenced. Of that amount, $77,000 was paid to Irwin for a consulting fee. The remaining amounts were made up of expenses such as legal fees, travel, and office equipment. There was no evidence in this financial summary that *any* of L&C's investment went to drilling oil wells, or credible testimony that drilling actually took place. The court therefore finds that ASH and Irwin had no intention of performing their representations as to the guarantee of production.

The circumstantial evidence also establishes that Peak knew the representations were false when made and that he made them with the intent that L&C should act on them. The testimony established that Irwin was in constant contact with Peak as to the negotiations, and that Peak was aware of all the terms of the agreements. Lawrence established that Irwin told him he was conferring and working with Peak regarding the production guarantees, that it was necessary that Peak approve the guarantees, and that Peak in fact approved them. After L&C failed to perform and Lawrence requested that ASH return L&C's funds, Irwin told Lawrence that he would need to speak with Peak about releasing the funds and then get back to Lawrence.

D

Finally, the court finds that L&C relied on the misrepresentations concerning a production guarantee when investing

with ASH, and that it was injured as a result.  Lawrence credibly testified to this reliance, i.e., that the only way L&C would have done business with ASH was if such a guarantee had been made.  And Irwin admitted that a production guarantee was a unique promise in oil and gas transactions.  It is logical that such an unusual guarantee induced L&C to invest with ASH.  Therefore, L&C proved that it relied on the misrepresentations, thereby injuring L&C by inducing it to invest over $1 million, for which it received nothing in return.

E

Irwin and Peak maintain they cannot be held individually liable for any fraud committed by ASH because this would amount to piercing the corporate veil.[7]  The fraud claims against Irwin and Peak, however, do not rely on piercing the corporate veil. Instead, they are claims against Irwin and Peak for their actions as individuals, not as representatives of ASH.  "In an action seeking to hold an agent individually liable for his tortious or fraudulent acts, the corporate veil is not required to be pierced." *Sanchez v. Mulvaney*, 274 S.W.3d 708, 712 (Tex. App. 2008, no pet.) (citing *Gore v. Scotland Golf, Inc.*, 136 S.W.3d 26, 32 (Tex. App.

---

[7]Peak also argued during trial that he could not be held individually liable under Florida law.  He did not establish, however, that Florida law insulates a person from liability for the commission of fraud committed in his individual capacity.  And to the extent Florida law would prevent his being held liable for ASH's conduct, the court is not holding Peak liable on that basis (e.g., for breach of contract).

2003, pet. denied)).   Therefore, Irwin and Peak can be held individually liable for defrauding L&C.

                                    IV

    L&C also asserts a claim for fraudulent inducement.   Such claims are generally available when "'the contract under which payment is made was procured by fraud.'"   *United States ex rel. Coppock v. Northrup Grumman Corp.*, 2003 WL 21730668, at *15 (N.D. Tex. July 22, 2003) (Fitzwater, J.) (quoting *United States ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 384 (5th Cir. 2003)).   Because the court has already found that defendants' fraudulent misrepresentations caused L&C to enter into the contracts, the court also finds L&C has proved its fraudulent inducement claim against all three defendants.

    Irwin and Peak again maintain that they could not be held individually liable.   But despite defendants' arguments to the contrary, including their attempts to invoke such defenses as the corporate veil doctrine, in Texas "[a]gents are personally liable for their own torts," including fraudulent inducement.   *Miller v. Keyser*, 90 S.W.3d 712, 718 (Tex. 2002); *see also Brown v. Bowers*, 2008 WL 2152889, at *3 (Tex. App. May 22, 2008, no pet.). Therefore, L&C can recover against Irwin and Peak individually.

                                    V

    The court need not reach L&C's conversion claim, which it asserts in the alternative.

                                 - 20 -

VI

Because the court has found that L&C has proved its claims against defendants, it must determine whether L&C is entitled to recover damages and, if so, in what amount.

A

Because none of the parties has submitted flawless damages calculations, the court has made a reasonable calculation based on the trial evidence.  Under Texas law, "[o]ne is not excused for a breach of contract resulting in damages simply because those damages may not be established with exact certainty."  *Stewart & Stevenson Servs., Inc. v. Enserve, Inc.*, 719 S.W.2d 337, 346 (Tex. App. 1986, writ ref'd n.r.e.).  "[M]athematical precision is not required to establish the extent or amount of one's damages[;] one must bring forward the best evidence of the damage of which the situation admits, and there must be some basis for reasonable inferences."  *Richter, S.A. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 939 F.2d 1176, 1188 (5th Cir. 1991) (quoting *Gulf Coast Inv. Corp. v. Rothman*, 506 S.W.2d 856, 858 (Tex. 1974)).

"Generally, the measure of damages for breach of contract is that which restores the injured party to the economic position he would have enjoyed if the contract had been performed."  *Penner Cattle, Inc. v. Cox*, 287 S.W.3d 370, 372 (Tex. App. 2009, pet. denied) (citations omitted).  Damages for the breach of contract claim should restore L&C to the position it would have been in had

- 21 -

the contracts not been breached.  Therefore, the court awards L&C the benefit of the bargain: the value of the 71,280 barrels of oil guaranteed in the contracts.

The contracts state the guarantees are for a certain number of barrels per day for at least one year.  The court will only award damages for one year's worth of oil under the guarantee because that is all L&C argued for at trial.  Although the language of the contracts may contemplate a production guarantee of greater than one year's worth of oil, the court has no basis to award more than that.  Under the terms of the contracts, the court finds it reasonable to calculate the guarantee as of one year after the promise was made, or April 2007.  L&C presented evidence as to the price of oil on this date, and defendants have not argued that the one-year measure is unreasonable.

For the Ft. Payne production and the corresponding 38,880 barrels, L&C would receive its share of the production, set at 55% of the Net Working Interest, calculated after the 12.5% overriding royalty is paid to the landowner.  In other words, L&C is entitled to 55% of 87.5% of the barrels, or 48.125%.  For the Knox production and the corresponding 32,400 barrels of oil, L&C is entitled to 55% of the Net Working Interest after a 22.5% overriding royalty is paid to the landowner, meaning 55% of 77.5%, or 42.625%.  Although L&C argued that defendants verbally represented the production guarantees in terms of whole barrels of

oil, as opposed to these percentages, the MOU and the Knox Operating Agreement support that the understanding at the time was that L&C would only receive a portion of the guaranteed barrels of oil.

According to the report on oil and gas prices presented by L&C's expert, the value of a barrel of oil as of April 2007 was $56.075. Taking the correct percentage of each barrel and multiplying by the number of barrels guaranteed under the respective agreements, the value of the contracts' guarantees is $1,049,219.33 for Ft. Payne and $774,423.79 for Knox, or a total of $1,823,643.12. The court therefore awards L&C the sum of $1,823,643.12 in damages against ASH for breach of contract.

B

L&C is also entitled to recover reasonable attorney's fees under Texas law for breach of contract. *See* Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8) (Vernon 2008). If L&C elects to recover judgment under its breach of contract theory, *see infra* § VII, it may apply for an award of attorney's fees and costs under the procedure established in Fed. R. Civ. P. 54(d)(2) and N.D. Tex. Civ. R. 54.1, to be filed in accordance with the deadlines prescribed by these rules.

C

The court next considers whether, and to what extent, actual damages should be awarded for fraud and fraudulent inducement.

- 23 -

"Texas recognizes two measures of direct damages for common-law fraud: the out-of-pocket measure and the benefit-of-the-bargain measure." *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex. 1998) (citations omitted). Here, the benefit-of-the-bargain measure would compensate L&C for the damage done by defendants' fraud. "[T]he benefit-of-the-bargain measure computes the difference between the value as represented and the value received." *Id.* This difference is the damages awarded under the breach of contract claim: $1,049,219.33 for Ft. Payne and $774,423.79 for Knox, or a total of $1,823,643.12.

D

State law governs the award of prejudgment interest in diversity cases. *DP Solutions, Inc. v. Rollins, Inc.*, 353 F.3d 421, 435 (5th Cir. 2003). Prejudgment interest only applies to actual damages. *See Halff Assocs., Inc. v. Warner Pac. Props., LLC*, 2008 WL 3874673, at *2 (N.D. Tex. Aug. 13, 2008) (Boyle, J.) (applying Texas law to calculate prejudgment interest on breach of contract claim). "Obviously, in any breach of contract case, the failure of one party to pay another will deprive the innocent party of the use of that money. Prejudgment interest compensates injured parties for this damage." *Penner Cattle*, 287 S.W.3d at 372.

When there is no specific enabling statute granting damages, Texas allows for the award of prejudgment interest under "general principles of equity" and follows the principles currently set out

in Tex. Fin. Code Ann. § 304 (Vernon 2008). *See Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998). Interest "begins to accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim or (2) the date suit is filed." *Id.* at 531. It "accrues at the rate for postjudgment interest and it shall be computed as simple interest." *Id.* at 532; *see also Giddy Up, LLC v. Prism Graphics, Inc.*, 2007 WL 3125312, at *1 (N.D. Tex. Oct. 24, 2007) (Boyle, J.) ("In keeping with the principles articulated in *Johnson & Higgins*, the Court will follow the prejudgment interest rules described in the Texas Finance Code.") (applying Texas law to calculate prejudgment interest on breach of contract and fraud claim).

Because of the considerable delay in L&C's receiving the promised production guarantee, the court awards prejudgment interest for the value of the actual damages for all of the claims at the post-judgment rate of interest calculated using simple interest from the date this action was filed in Texas state court, October 9, 2007.

E

Texas law also provides that L&C may recover exemplary damages.

To recover exemplary damages, L&C must prove by clear and convincing evidence that "the harm with respect to which the claimant seeks recovery of exemplary damages results from: (1)

- 25 -

fraud; (2) malice; or (3) gross negligence." Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a) (Vernon 2008). L&C proved by clear and convincing evidence that the harm caused by defendants ASH and Irwin resulted from fraud in the form of the fraudulent misrepresentations made by them to L&C regarding the production guarantee. L&C is entitled to recover exemplary damages from ASH and Irwin on its claims for fraud and fraudulent inducement. As the court explains above, *see supra* note 5, although L&C proved its fraud claims against Peak by a preponderance of evidence standard, it did not satisfy the clear and convincing evidence standard as to Peak. Therefore, L&C is limited to recovering actual damages from him on its fraud claims.

Under Texas law, exemplary damages are limited to two times the amount of economic damages, plus an amount equal to any noneconomic damages, not to exceed $750,000; or $200,000. *Id.* at § 41.008(b). Additionally, exemplary damages are not subject to prejudgment interest. *Id.* at § 41.007. The court may consider various factors in determining the amount of exemplary damages, including:

> (1)  the nature of the wrong;
> (2)  the character of the conduct involved;
> (3)  the degree of culpability of the wrongdoer;
> (4)  the situation and sensibilities of the parties concerned;
> (5)  the extent to which such conduct offends a public sense of justice and propriety; and
> (6)  the net worth of the defendant.

- 26 -

*Id.* at § 41.011(a).

Considering all of these various factors, and based on the clear and convincing evidence adduced at trial, the court awards L&C exemplary damages against ASH in the sum of $3,647,286.24, and exemplary damages against Irwin in the sum of $3,647,286.24.

VII

Under Texas law, "[w]hen a party tries a case on alternative theories of recovery and [the trier of fact] returns favorable findings on two or more theories, the party has a right to a judgment on the theory entitling him to the greatest or most favorable relief." *Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.*, 747 S.W.2d 785, 787 (Tex. 1988).

The court assumes that L&C would elect to recover from ASH on its fraud or fraudulent inducement claim rather than on its breach of contract claim because its recovery would be greater or more favorable. Accordingly, in the judgment filed today, the court is awarding L&C judgment against ASH for actual damages of $1,823,643.12, plus prejudgment interest thereon, and exemplary damages in the sum of $3,647,286.24. If L&C desires instead to recover for breach of contract, it may file a timely motion for relief from the judgment.

Regardless whether L&C elected to recover from Irwin for fraud or fraudulent inducement, it would be entitled to recover actual damages of $1,823,643.12, plus prejudgment interest thereon, and

exemplary damages in the sum of $3,647,286.24.  The court awards this relief in the judgment filed today.

Regardless whether L&C elected to recover from Peak for fraud or fraudulent inducement, it would be entitled to recover actual damages of $1,823,643.12, plus prejudgment interest thereon.  The court awards this relief in the judgment filed today.

L&C is also entitled to recover its taxable costs of court from each defendant.

*     *     *

Accordingly, for the reasons explained, the court finds for L&C on its breach of contract claim against ASH and on its fraud and fraudulent inducement claims against ASH, Irwin, and Peak.  A judgment in L&C's favor is being filed contemporaneously with this memorandum opinion.

September 29, 2009.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE